Argued and submitted November 29, 2000, affirmed February 7, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# JEFFERY HARLAN MOORE,.
*Appellant.*

## (9802-31388; CA A106044)

19 P3d 911

Louis R. Miles, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Cheryl Thompson-Merrill, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

**BREWER, J.**

Defendant appeals from convictions after a bench trial for manufacture and possession of a controlled substance. ORS 475.992(1); ORS 475.992(4). Defendant contends that the trial court erred in imposing enhanced sentences for the convictions by classifying them as "commercial drug offenses." *See* ORS 475.996(1)(b). We review for errors of law, *State v. Hennings*, 134 Or App 131, 894 P2d 1192 (1995), and affirm.

Because defendant was convicted, we state the facts in the light most favorable to the state. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). In January 1998, police officers went to defendant's residence to investigate a suspected marijuana growing operation. The officers announced themselves and knocked on the door, but no one answered. While standing outside, the officers smelled the odor of freshly cut marijuana. The officers then began the process of obtaining a warrant to search the residence. While waiting for the warrant to issue, the officers smelled burning marijuana, and they saw smoke billowing from the chimney of the residence. The officers then forced open the door of the residence in order to find and stop the destruction of evidence. They were met by gunfire from defendant's roommate, Stephen Dons. Dons shot and killed one of the officers.

Defendant was not at home at the time of the incident. Eventually, the state charged defendant and Dons with manufacture and possession of marijuana, among other crimes not relevant to this appeal.[1] The indictment also alleged that the controlled substance offenses were commercial drug offenses under ORS 475.996(1)(b), which provides that manufacture or possession of a controlled substance is a commercial drug offense when "accompanied by" any three factors listed in 11 subsections. The list of factors includes:

"(C) The offender was unlawfully in possession of a firearm or other weapon as described in ORS 166.270(2), or the offender used, attempted to use or threatened to use a

---

[1] Defendant and Dons were indicted as codefendants on the offenses at issue here.

deadly or dangerous weapon as defined in ORS 161.015, or the offender was in possession of a firearm or other deadly or dangerous weapon as defined in ORS 161.015 for the purpose of using it in connection with a controlled substance offense;

"* * * * *

"(G)  Modification of structures by painting, wiring, plumbing or lighting to facilitate a controlled substance offense;

"(H)  The offender was in possession of manufacturing paraphernalia, including recipes, precursor chemicals, laboratory equipment, lighting, ventilating or power generating equipment; [or]

"* * * * *

"(J)  The offender had constructed fortifications or had taken security measures with the potential of injuring persons[.]" ORS 475.996(1)(b).

At trial, defendant's neighbor, Tellegen, testified that his girlfriend had given defendant a book on indoor marijuana growing in October 1993. Around the same time, defendant purchased six small marijuana plants from Tellegen. Officers testified that the operation came to their attention in October 1997 when they followed Dons from an agricultural supply store to a nursery and then to defendant's residence. The officers obtained utility records for the residence reflecting "consistently high" kilowatt usage that could support a marijuana growing operation.

■  Defendant's children visited him from mid-December 1997 through mid-January 1998. Defendant's daughter stated that, while she was there, one room on the ground floor was locked to prevent entry and that she heard a humming noise coming from the room. Defendant told her that the room was used only for storage, and he became angry when he believed that his children had entered the room. Tellegen testified that Dons performed all the work for the marijuana operation and that defendant had told him that they were "keeping the door shut" on the marijuana grow while defendant's children were visiting.[2]

---

[2] At trial, Tellegen testified that Dons did all the work in the operation, but he stated that epilepsy affected his memory to such an extent that he could not

The officers searched defendant's residence after the shooting in January 1998. One ground-floor bedroom off the living room served as the marijuana growing room. It housed a fan, duct work, chemicals, and plastic bags containing dirt and fertilizer. A hatchway led to a crawl space used for venting. The officers testified that the hatchway and crawl space were modifications of the structure that facilitated the manufacturing process. The electrical configuration of the growing room also had been modified. Track lighting rails had been affixed to the ceiling, and a motor and halide lamps with reflective hoods were mounted on the rails. A fingerprint was found on the rails that later was identified as defendant's. Two electrical transformers had been installed, and they made a humming sound in operation. Officers found plastic bags containing potting soil and 51 marijuana plants of various sizes. In the closet, the officers found a fluorescent light fixture of a type often used to start plants in a marijuana growing operation.

In Dons's bedroom, the officers found a variety of firearms. They also found a video monitor wired to a live-feed security camera mounted in the laundry room that provided a view of the driveway in front of the residence. The camera would not capture the image of someone standing directly outside the door, as if to knock. The camera had been installed without the capacity to record the images it captured. Both camera and monitor were plugged in and turned on when officers discovered them.

In defendant's bedroom, the officers found two pistols, a shotgun, an SKS assault rifle, and a variety of ammunition. In the closet, officers found a receipt from an agricultural supply store for transformers, hoods, and track lighting rails. The closet also contained the cardboard shipping box

---

remember defendant telling him that defendant and Dons would be "keeping the door shut." However, Tellegen had testified to that effect before the grand jury. At trial, the presiding grand juror testified without objection that his notes and recollection reflected that, in reference to the marijuana growing operation, "according to Mr. Tellegen, defendant said 'we're just keeping the door shut' while the children visited." Where a witness at trial does not recall the events at issue, but has testified about the same events before a grand jury, evidence of the witness's prior testimony is admissible as substantive evidence. *State v. Staley*, 165 Or App 395, 405, 995 P2d 1217 (2000). Accordingly, we treat Tellegen's grand jury testimony as substantive evidence.

for the track lighting motor. In the kitchen, officers discovered another SKS assault rifle and a loaded drum magazine containing 100 rounds of ammunition. In the living room, officers found a woodburning stove containing partially burnt, green vegetable matter that looked like marijuana.

Defendant testified that he worked long hours as a computer network specialist. He had met Dons in college, and, after defendant and his wife separated in 1994, he invited Dons to move into the home defendant was renting. From then until the shooting, defendant supported Dons financially. Dons worked sporadically and rarely contributed to rent, food, or utility costs. Defendant stated that he and Dons shared a passion for firearms:

> "[W]e were into accessorizing our weapons, that sort of thing. And so over a period of years, we both accumulated a large collection of artifacts. I mean, you see here ear protection, ammunition, shotgun shells, you know. Some people would probably say we had a large armory or, you know, something of that nature. But the fact of the matter is we shot so much that we could achieve a significant savings by buying ammunition in bulk."

Defendant testified that he had told police that one of Dons's firearms was a semi-automatic rifle equipped with a "Hell-Fire" trigger mechanism. Further, he indicated that the loaded drum magazine did not fit his firearms. Defendant also stated that he had "no idea" that marijuana had been growing in the residence.

At the conclusion of the nonjury trial, the trial court found defendant guilty of possession and manufacture of a controlled substance. With respect to the subclassification factors alleged to establish a commercial drug offense, the court found:

> "I make the findings under the subcategories that the factors have been proven that the structure had been altered, that there was possession of manufacturing paraphernalia and that security measures had been taken, which had the potential to injure police officers or anybody else, for that matter, but certainly police officers."

Because the court found that three subcategory factors were proved, it treated the convictions as commercial drug

offenses,[3] thus elevating the convictions to crime seriousness level eight under the sentencing guidelines. ORS 475.996(1). The court imposed concurrent departure sentences on each conviction of 36 months' imprisonment with 36 months' post-prison supervision.

On appeal, defendant assigns error to the trial court's finding that the crimes were commercial drug offenses.[4] *See* ORS 475.996(1)(b). Defendant contends that the state did not produce sufficient evidence to prove two of the subcategory factors found by the court. Defendant also asserts that there was no evidence that any of the factors "accompanied" the underlying offenses.

To establish a commercial drug offense, the state must prove beyond a reasonable doubt three of the sentencing subcategory factors listed in ORS 475.996(1)(b). *See* ORS 132.557;[5] *State v. O'Quinn*, 151 Or App 168, 947 P2d 1135 (1997). The indictment alleged, as subcategory factors, that petitioner: (1) used a dangerous weapon; (2) possessed a dangerous weapon for the purpose of using it in connection with a controlled substance offense; (3) modified structures to facilitate the offense; (4) possessed manufacturing paraphernalia such as recipes, precursor chemicals, laboratory equipment, or lighting to facilitate the offense; and (5) had constructed fortifications or taken security measures with the potential of injuring persons. The trial court found that factor (1) above was not present, and the state does not cross-assign

---

[3] The court made no express finding on one factor alleged in the indictment—possession of a dangerous weapon for the purpose of using it in connection with the controlled substance offense. ORS 475.996(1)(b)(C).

[4] Defendant does not challenge his convictions for the underlying crimes; he challenges only the sentencing classification of the crimes as commercial drug offenses.

[5] ORS 132.557 provides:

"(1) When a person is charged with a crime committed on or after November 1, 1989, that includes subcategories under the rules of the Oregon Criminal Justice Commission, the state is required to plead specially in the indictment, in addition to the elements of the crime, any subcategory fact on which the state intends to rely to enhance the crime for sentencing purposes. The state shall plead the elements and subcategory facts in a single count. Nothing in this subsection precludes the pleading of alternative theories.

"(2) The state must prove each subcategory fact beyond a reasonable doubt and the jury shall return a special verdict of 'yes' or 'no' on each subcategory fact submitted."

error to that ruling. Defendant concedes, as he did at trial, that the evidence established modifications to the residence, leaving two factors at issue.

**2, 3.** First, defendant contends that the evidence did *not* establish that he possessed manufacturing paraphernalia:

> "There was evidence of manufacturing paraphernalia found in the grow room, and in [Dons]'s bedroom, which were next to each other on the main floor of the residence. This constituted evidence only of [Dons]'s manufacturing paraphernalia. *There was no evidence that defendant possessed it at any time, and no such inference can properly be made.*" (Emphasis added.)

In short, defendant asserts that the evidence established only that *Dons* possessed manufacturing paraphernalia. Defendant cites *State v. Lark,* 316 Or 317, 851 P2d 1114 (1993), for the proposition that a sentencing enhancement factor may not be imputed to him based on Dons's conduct. According to *Lark,*

> "[w]hen a factor describes conduct of the offender—such as, 'the offender caused or threatened to cause serious physical injury to the victim,'—then the subcategory based on that factor applies to a defendant only if the defendant personally engaged in the described conduct." *Id.* at 325.

Underlying defendant's argument is the premise that only one person can possess drug paraphernalia at a time. That premise is faulty. *State v. Coria,* 39 Or App 507, 511, 592 P2d 1057, *rev den* 286 Or 449 (1979) (right of control over controlled substances may be exercised jointly with other persons; it need not be exclusive in order for defendant to be criminally responsible). "A person may possess a drug by having dominion or control. Consequently, physical possession is not the only means to possess under ORS 475.992(4)." *State v. Anaya,* 111 Or App 204, 207, 826 P2d 27 (1992); *see also* ORS 161.015(8) (defining "possess" as "to have physical possession *or otherwise to exercise dominion or control over property*") (emphasis added). In this case, the officers found the paraphernalia in defendant's residence, they found defendant's fingerprints on the track lighting itself, and they found receipts and a box corresponding to other paraphernalia in defendant's closet. Regardless of

Dons's role, the evidence was sufficient to find that defendant *personally* had the power to exercise control over the manufacturing paraphernalia and, thus, possessed it. .

■ Defendant also contends that the evidence did not establish that he had taken security measures with the potential to injure persons. Defendant asserts that the only evidence of security measures involved the camera and monitor, which he contends do not have "the potential of injuring persons" within the meaning of ORS 475.996(1)(b). He argues that the statute refers to devices such as booby traps and spring guns. The state responds that "security measures" encompass more than those devices and that, in addition to the camera and monitor, Dons's *presence* as an armed guard constituted a security measure.

■ ■ Whether the phrase "security measures with the potential to injure persons" includes surveillance equipment or an armed guard presents a question of statutory construction. In interpreting a statute, the court's task is to discern the intent of the legislature. ORS 174.020; *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). The best evidence of legislative intent is the text and context of the statute. *Id.* at 610-11. The term "security measures" is not defined by statute and appears nowhere else in chapter 475.[6] Therefore, we give those words of common usage their plain, natural, and ordinary meaning. *PGE*, 317 Or at 611. In this case, we first look to the dictionary definitions of "security" and "measures." "Security" is defined as "something that secures." Synonyms listed for that term are "defense, protection, guard." *Webster's Third New Int'l Dictionary*, 2054 (unabridged ed 1993). Insofar as relevant here, "measure" is defined as "an action planned or taken toward the accomplishment of a purpose." *Id.* at 1400. Thus, "security measures" include steps taken to defend, protect, or guard something. That definition is broad enough to encompass the use of human, mechanical, or electronic means of protection.

Defendant argues, however, that the security camera apparatus was not a security measure *with the potential*

---

[6] ORS 475.996 was enacted by the legislature but was not expressly made a part of ORS chapter 475. Legislative counsel placed the statute in chapter 475 for organizational ease of reference.

*to injure persons* because it was itself incapable of causing injury. The state concedes that the camera and monitor could not independently cause injury, but argues that

> "the security measures were more than the camera and monitor. Without a human to watch and respond to the live feed, the devices [would be] useless. The camera and monitor were part of the security system, but Dons was an integral part of the security system, because he acted as the guard."

We agree with the state. The evidence supported a finding that Dons was an armed guard who was posted, with the help of the electronic surveillance system, to respond to any perceived human threat to the drug operation. In plain terms, the overall surveillance system—consisting of human *and* electronic features—constituted a deadly security measure.

■       Although the trial court did not make specific findings as to defendant's role in posting Dons as a guard, it did conclude that defendant took "security measures with the potential to injure persons." Where the trial court does not make specific findings of fact underlying its ultimate conclusion, we will ordinarily presume that the court found facts consistent with that conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). Because the camera and monitor alone lacked the potential to injure persons, yet the trial court concluded that defendant had taken security measures, we presume that the court found that defendant *personally* was responsible for posting Dons as a guard for the grow operation.

■       Defendant cites *Lark* for the proposition that the "security measures" subcategory factor requires that the defendant personally must have taken the measures. Defendant argues that Dons's conduct cannot be attributed to him and, therefore, that Dons's conduct is irrelevant to analysis of the factor.[7] Although we agree that a sentencing enhancement factor that requires personal conduct by the defendant cannot be established by evidence of another person's conduct, *see Lark*, 316 Or at 325; *see also O'Quinn*, 151 Or App at

---

[7] Defendant does not actually address whether the posting of an armed guard would fall within the definition of "security measures."

173-74, it does not follow that the other person's conduct may not be considered for *any* purpose.

■    In *O'Quinn*, the defendant and a codefendant were charged with burglary. The state also alleged that, during the commission of the offense, the defendant was armed with a deadly weapon, a subcategory fact that would enhance the defendant's sentence. At trial, the evidence established that the codefendant had stolen a loaded firearm from the victim. No weapon was tied to the defendant. Relying in part on a theory of vicarious liability, the trial court ruled that, because the codefendant had been armed with a deadly weapon, the subcategory factor also applied to the defendant. On appeal, we rejected that reasoning:

> "The factor alleged is not a circumstance attendant to the dwelling, but describes a personal act by defendant. According to the court's findings, only the codefendant was personally armed. For those reasons, we hold that the court's conclusion that defendant was vicariously liable for the conduct of his codefendant was error and that defendant's sentence cannot be enhanced under the circumstances." *Id.* at 174.

That rule does not, however, preclude the consideration of evidence tending to show that *defendant himself* previously had arranged for Dons to stand guard over the operation. Here, the evidence supported the trial court's implied finding that defendant was jointly responsible for posting Dons as a guard. Defendant paid the rent and the utility bills for the residence, including the abnormally high electricity bills. He bought the plants to begin the operation, and he bought and handled lighting installed in the grow room. Incriminating evidence connecting defendant with the operation was found in his own bedroom. In addition, the evidence showed that defendant and Dons jointly planned "to keep the door shut" on the operation while defendant's children were visiting. In short, the evidence showed that defendant and Dons jointly conducted the grow operation.

But the evidence showed more than that. Defendant admitted that Dons paid almost no rent or food costs and that Dons did not have a steady job outside the house. Tellegen testified that Dons performed all of the work on the growing

operation. Because the surveillance equipment was live-feed only and did not provide a view of someone at the front door, it was useful only to the extent that it was consistently monitored. Defendant knew that Dons owned and possessed lethal firearms, including ammunition, and defendant's own weapons were available to Dons. From those facts, the trial court reasonably could have inferred that defendant contributed money and a location for the operation, while Dons contributed labor by acting as, among other roles, an armed guard. In light of the evidence, we conclude that a rational trier of fact could find that defendant himself took security measures with the potential of harming others by utilizing Dons as an armed guard in a surveillance capacity.[8]

Finally, defendant argues that, even if the state presented sufficient evidence to establish three subcategory factors, it nevertheless did not prove that the factors "accompanied" the drug offenses, as required by ORS 475.996(1)(b). Defendant contends that

"the legislature was not just listing factors which would increase a defendant's sentence if they happened to exist with a drug offense as if by coincidence. Instead, it was listing factors which would indicate that the drug offense was something more than just a singular episode, that it was part of a larger commercial enterprise. It was termed a 'commercial drug offense.' *For the factors to indicate that larger enterprise, they must somehow be related to the drug offense and not just exist contemporaneously with it.*" (Emphasis added.)

Defendant's argument is not persuasive. To "accompany" means "to exist or occur in conjunction with." *State v. Norris*, 40 Or App 505, 508, 595 P2d 1261, *rev den* 287 Or 355 (1979). Here, officers found the track lighting in the growing room. Dons, acting as a guard, equipped with camera and monitor, defended the operation with deadly force. Finally,

---

[8] Defendant also argues that the evidence was insufficient to establish that he possessed a dangerous weapon for the purpose of using it in connection with a controlled substance offense. ORS 475.996(1)(b)(C). Although defendant concedes that the evidence was sufficient to show that he possessed the firearm found in his bedroom, he contends that the state offered no evidence that he possessed it "for the purpose of using it in connection with a controlled substance offense." Because we conclude that the state proved three other factors listed in ORS 475.996(1)(b), we do not reach defendant's argument.

the structural modifications directly facilitated the operation. All three factors occurred or existed in conjunction with, and thus accompanied, the drug offenses for which defendant was convicted. We conclude that the state presented sufficient evidence that the factors accompanied the drug offenses.

In sum, the state presented sufficient evidence to establish that at least three subcategory factors under ORS 475.992(1)(b) accompanied defendant's offenses. Therefore, the trial court did not err in determining that the controlled substance crimes for which defendant was convicted were commercial drug offenses.

Affirmed.